Simon P. Douthart, Ex'r, etc., v. Charles B. Congdon.

1. BURDEN OF PROOF—*Showing that a Contract is Founded in Part upon an Illegal Consideration.*—Where a party alleges that his written promise is invalid, because founded in part upon an illegal consideration, the burden of establishing such contention is upon him, and where, in endeavoring to evade his promise, he charges that a portion of the consideration arose out of the illegal act of the promisee, the burden of proof is upon him to make out such contention.

2. CONTRACTS—*The Fact that a Broker Has No License Does Not of Itself Render Contracts Made by Him Void.*—The fact that a broker was transacting his business in violation of a city ordinance, does not of itself render contracts made by him while so acting void, or affect their character as evidence.

3. SAME—*Actions upon Contracts Made by Brokers While Acting Without License.*—The rule that an action can not be maintained when it is predicated upon a transaction prohibited by law, does not apply to promissory notes made by a broker in his business while acting without license, when a license is required by an ordinance of the city of Chicago. The city may punish him for so acting, but it is powerless to invalidate his contracts.

4. BROKERS—*Validity of Contracts Made by, While Acting Without License.*—A contract made by a broker in the city of Chicago, while acting without a license, as required by an ordinance, is not void on that account, and a recovery may be had upon it.

5. SAME—*Contracts Made in Violation of Ordinances, When Void.*—

Where a contract is made by a broker while acting without a license, and in violation of an ordinance, and such ordinance is enacted for the purpose of raising revenue, the contract is not void; but if the ordinance was intended to prohibit the acts done, under a penalty, and thus render them illegal, it is void, and no recovery can be had upon it.

6. CITIES AND VILLAGES—*Statutes and Ordinances Authorizing the Licensing of Brokers, etc., Are Revenue Measures.*—The statute (Hurd's R. S. 1897, p. 272) authorizing cities and villages to tax, license and regulate money changers, brokers, etc., and the ordinances enacted under it, do not prohibit the carrying on of such occupations without license, but are enacted to enable such municipalities to obtain revenue from licenses issued by them.

**Claim in Probate,** on four promissory notes. Appeal from the Circuit Court of Cook County; the Hon. CHARLES G. NEELY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1900. Affirmed. Opinion filed November 26, 1901.

**Statement.**—Upon the trial of this case, begun in the Probate Court and taken by appeal to the Circuit Court, the following stipulation was made:

"During the years 1883, 1884, 1885, 1886 and 1887, the claimant, Charles B. Congdon, and one Ernest A. Hamill, were copartners doing business as commission merchants and brokers upon the Board of Trade in the city of Chicago, under the firm name and style of Hamill & Congdon; the place of business of said firm was located in the said city of Chicago, and their business was that of buying and selling provisions and grain belonging to and for others, on the Chicago Board of Trade, for a commission or other compensation. During the period aforesaid, and during the entire period of the transactions in connection with which the notes sued on were given, the plaintiffs and Daniel Butters were members in good standing of the said Board of Trade, and the transactions between Hamill & Congdon and Daniel Butters, which resulted in the giving of the notes aforesaid, were had upon the same."

It was further stipulated that the city of Chicago was in 1883 and ever since has been a municipal corporation in the State of Illinois, and incorporated under the general city and village act; that there was in full force and effect on the twenty-second day of October, A. D. 1883, and up to and including the thirty-first day of December, A. D. 1890, the following ordinance:

Douthart v. Congdon.

"1499.   Brokers, etc.—License required.   Be it ordained by the City Council of the City of Chicago: Section 1.   It shall not be lawful for any person to exercise within this city the business of a money changer, or banker, broker, or commission merchant, including that of merchandise, produce or grain broker, real estate broker and insurance broker, without a license therefor."

It was further stipulated that during the years 1884, 1885, 1886 and 1887 there were issued to the said firm of Hamill & Congdon, pursuant to the ordinance aforesaid, the following licenses for the following purposes and on the following dates:

License No. 464 on January 10, 1884, to Hamill & Congdon, at 156 Washington street, Chicago, as commission merchants.

License No. 156 on June 14, 1884, to Hamill & Congdon, No. 156 Washington street, Room 10, Chicago, as commission merchants.

License No. 223 on July 8, 1885, to Hamill & Congdon, at No. 8 Pacific avenue, Chicago, as commission merchants.

License No. 304 on November 24, 1886, to Hamill & Congdon, of 8 and 10 Pacific avenue, Chicago, as brokers.

License No. 410, dated June 14, 1887, to Hamill & Congdon, of 8 and 10 Pacific avenue, as brokers.

It was further stipulated, that the said licenses each and all contained among other matters the following:

"The penalty for doing a brokerage business without a license is not less than $25 nor more than $100.   The payment of commissions can not be enforced by law unless the party negotiating sale or transaction has a city license as a broker."

The firm of Hamill & Congdon paid for licenses to the city collector:

(1.)   On January 10, 1884, $22.92, which was the proportion of the annual license fee of $25 for the period commencing June 11, 1883, when said ordinance went into effect, and terminating May 1, 1884.

(2.)   On June 14, 1884, the sum of $25 as a license fee under said ordinance and for the license No. 155 issued to them on that date.

(3.) On July 8, 1885, $25 as license fee under said ordinance and for the license No. 223 issued to them on that date.

(4.) On November 24, 1886, the sum of $25 as license fee under said ordinance and for the license No. 304 issued to them on that date.

(5.) On June 14, 1887, the sum of $25 as license fee under said ordinance and for the license No. 410 issued to them on that date; and that neither Hamill & Congdon nor Charles B..Congdon paid any other license fees or obtained any other licenses under said ordinances during the years 1883, 1884, 1885, 1886 and 1887.

It was further stipulated that the transactions which resulted in the giving of the notes aforesaid, and out of which grew the consideration for said notes, were purchase and sale of grain on Chicago Board of Trade by the firm of Hamill & Congdon for the deceased, Daniel Butters, and at his instance and request; that the transactions were made on said Chicago Board of Trade under the rules and forms thereof, in the name of Hamill & Congdon with other members thereof; that an account thereof was kept in the books of Hamill & Congdon and statements thereof from time to time rendered by Hamill & Congdon to Daniel Butters, which were never objected to by him; that Hamill & Congdon charged for said purchase and sales a commission of one-eighth per cent per bushel for the grain bought and sold as aforesaid for Daniel Butters, and in said statements to said Butters and on their books charged their commissions to Daniel Butters and credited themselves with the same at the rate aforesaid, so that the commissions so charged as aforesaid for the transactions shown by said ledger account hereinafter set out, are in part consideration for the notes sued on; and the remainder of the considerations were amounts paid by Hamill & Congdon on account of said purchases and sales; that all of the original contracts, licenses, cards, statements, books and papers relating to said transactions in the possession of Hamill & Congdon were, without the fault of Hamill & Congdon, destroyed by fire in

Douthart v. Congdon.

November, 1890, except a ledger of which the following is a copy so far as the entries therein relate to said transactions between Daniel Butters and Hamill & Congdon on page 243 thereof:

"D. BUTTERS.

| 1885. | | | | | | 1886.<br>Oct. 30,<br>by Suspense. |
|---|---|---|---|---|---|---|
| Apr. 1, | To Led. A. | | 306 | 2,652.65 | | |
| " 9, | " Loss, | 5 May, | w 406 | 300.00 | | |
| June 2, | " " | 25 July, | w 409 | 193.75 | 471 | 3,458.91 |
| Aug. 1, | " " | 10 Sept., | w 419 | 62.50 | | |
| Feb'y 23, '86, | " " | 10 June, | w 438 | 250.00 | | |
| | | | | 3,458.91 | | 3,458.91 " |

and page 269:

SUSPENSE ACCOUNT.

1886.
Oct. 30.   To D. Butters.......................$3,458 91
1890.
July 9.   By profits on books of C. B. Congdon
          & Co............................   600 00
Dec. 31.   Daniel Butters, account settled by notes,
          ½ each E. A. H. and C. B. C........ 3,248 19

And that in accordance with said memorandum or entry last given on December 31, 1890, said Daniel Butters, deceased, in settlement of said account, gave to E. A. Hamill and Charles B. Congdon his notes aggregating $3,258.19, as follows:

Note to Charles B. Congdon, dated December 31,
   1890, for six months......................$  814 55
Note to Charles B. Congdon, dated December 31,
   1890, nine months........................,   407 27
Note to Charles B. Congdon, dated December 31,
   1890, at twelve months, for..............   407 28
Note to Ernest Hamill, dated December 31, 1890,
   six months...................................   814 55
Note to Ernest Hamill, dated December 31, 1890,
   at nine months............................   407 27
Note to E. A. Hamill, dated December 31, 1890,
   at twelve months, for....................   407 27

                    Total................$3,258 19

Of which said notes last mentioned the four notes offered
in evidence by the plaintiff in this case were part and parcel,
and of which the notes for $814.55 to C. B. Congdon and
for $814.55 to E. A. Hamill were paid by said Daniel But-
ters in his lifetime. All of the notes bore interest at six per
cent per annum.

It was stipulated that if Charles B. Congdon and E. A.
Hamill were called as witnesses, they would testify that in
making payments of license fees and taking out said licenses
they acted in good faith and without attempt to evade the
law, which evidence is objected to by attorney for said estate
as being incompetent, irrelevant, immaterial and unlawful.

The court found for the claimant for $2,131.74, being the
total amount claimed, $2,190, minus $58.27 deducted as ille-
gal commissions.

DOUTHART & BRENDECKE, attorneys for appellant.

FRANK F. REED, attorney for appellee.

MR. JUSTICE WATERMAN delivered the opinion of the court.

It is insisted by appellant that a portion of the transac-
tions resulting in the giving of the four notes upon which
suit was brought were for commissions charged by Hamill
& Congdon upon grain, by them as commission merchants,
bought and sold for Daniel Butters at a time when they
had no license to act as such commission merchants, and
that a part of the consideration of the notes being illegal,
the notes were invalid *in toto* and nothing can be recovered
thereon. What appears in this record is, that while Hamill
& Congdon had licenses covering nearly the entire period
of the five years under consideration and paid therefor the
entire sum required by the ordinances of the city, or five
licenses, each for one year's duration, for several years, the
annual fee of $25 was not paid at the beginning of the
license year, but quite a time thereafter, and it is not cer-
tain from the evidence that the respective licenses covered
the entire five years that elapsed from June 11, 1883, when
the city ordinance went into effect. Upon the other hand,

it does not appear from the evidence that any of the trans-
actions out of which the indebtedness arose and for which
the notes in question were given, were had at a time when
Hamill & Congdon had not a license in accordance with
the ordinance of the city of Chicago.

Our attention has not been called to any case in which,
where it appears, as in the present controversy, that the
commission merchant had paid the license fee required for
the entire period covering the transactions, and had had a
license or licenses issued to him, his dealings were held un-
lawful, or he not to be entitled to recover commissions,
because his payments and licenses, while covering the
period, were not made until some time after transactions
took place.

It is a well known fact in Chicago and in other large
cities that at the beginning of what is known as the license
year, it is frequently very difficult, if not impossible, to
obtain licenses promptly, because of the great number of
applications therefor then being made, and the small force
which the city has for the accommodation of such appli-
cants.

In the present case it was stipulated that if said Charles
B. Congdon and E. A. Hamill were called as witnesses,
they would testify that in making said payments of said
license fees and taking out said licenses they acted in good
faith and without attempt to evade the law, which evidence
was objected to by appellant as incompetent, irrelevant and
immaterial.

Appellant urges and it has been said by the Supreme
Court of this State, " that where a part of the considera-
tion of a promise is illegal, the undertaking is invalid, be-
cause public policy will not permit a party to enforce a
promise which he has obtained by an illegal act or illegal
promise, although he may have connected with this act or
promise another which is legal." Henderson v. Palmer, 71
Ill. 579; and there are numerous authorities in other States,
as well as in England, to the same effect.

Where a party alleges that his written promise is invalid,

because founded in part upon an illegal consideration, the burden of establishing such contention is upon him; and most certainly where a promisor, in endeavoring to avoid his promise, charges that a portion of the consideration for which he gave his word arose out of the illegal act of the promisee, the burden of proof is upon him to make out his contention.

In the present case, the cause having been tried without a jury, the court found that there had entered into the indebtedness for which these and other notes were given, illegal commissions amounting to the sum of $58.27, and this sum the court deducted from the amount of the four notes. The court did not find, nor did the evidence show that illegal commissions entered into the consideration of each and all of the six notes given.

Two of the notes given by Daniel Butters, cotemporary with the four now under consideration, were paid by him in his lifetime.

The Supreme Court of this State in Murray v. Doud & Co., 167 Ill. 368–373, says:

" It appears, however, that there was in the city of Chicago an ordinance providing that it should not be lawful for any person to exercise within the city the business of broker, without a license, and it is contended that as Prentiss did not have a license from the city his acts were void. As bearing on the question, counsel have cited cases holding that a broker could not recover commissions for his services as broker where he had not taken out a license. Whether a broker could, without a license, recover his commissions, is a question upon which the authorities are not harmonious. But conceding that counsel may be right on that question, it does not follow that a contract consummated by the broker would be void. Nor does the rule declaring that an action can not be maintained which is predicated on a transaction prohibited by statute have any application to this case. The contract here involved was not unlawful nor was it prohibited. The mere fact that Prentiss was required to take out a license from the city and had failed to do so could not prevent him from bringing the parties together, nor did it prevent them from coming together in the sale and purchase of the commodity in

Douthart v. Congdon.

question.    If Prentiss violated the ordinance in failing to take out a license he might be liable to be prosecuted and fined, but that could not affect his acts so far as the rights of third parties were concerned.    This court held in Craig v. Dimock, 47 Ill. 308, that while congress had the power to require instruments valid under our State laws to be stamped, and had the consequent power to punish by fine any intentional evasion of the law, yet it had no power to require such instruments to be stamped as a prerequisite to their validity or to their admissibility in evidence in the State courts.    The principle involved in that case applies here.    While the city might punish by fine for a failure to act without license, it was powerless to do anything which might invalidate a contract made by the broker."

The question thus discussed in that case has not, so far as we are aware, been directly presented to and passed upon by the Supreme Court of this State.    In a number of cases the Appellate Court has held that in such a case a broker could not recover his commissions.    In view of this fact, and what is said by the Supreme Court in Murray v. Doud & Co., and a direct presentation of the question in the present controversy, a consideration of some of the inharmonious authorities upon this question is not out of place.

Our attention is called by appellant to the case of Robinson v. Bland, 2 Burrows, 1077.    This was an action brought upon a bill of exchange for 700 pounds sterling, in which the following facts were proved and admitted : The bill of exchange was given at Paris for 300 pounds lent by the plaintiff to Sir John Bland and for 372 pounds more lost at the same time and place by Sir John Bland to the plaintiff at play; that Sir John Bland was and the plaintiff is a gentleman.    The question before the court was whether, under these circumstances, the plaintiff was entitled to recover anything, and if so, what, from the defendant.    The court gave the plaintiff judgment for the 300 pounds loaned, with interest thereon down to the time of the adjudication.

In Stanwood v. Woodward, 38 Me. 192, the court held that as no person could be an innholder without being licensed according to the provisions of the statute, an unlicensed person could not maintain a lien upon the property of one who had boarded at his house.

In Holt v. Green, 73 Pa. State, 198, the plaintiff brought suit as a broker. Upon trial it appeared that he had not taken out a broker's license nor paid a special tax under the act of congress, whereupon he was non-suited. On appeal, the decision of the *nisi prius* court was affirmed, the Supreme Court saying:

"We are aware there are some English authorities, as well as decisions in some of our sister States, that make a distinction in cases of contracts predicated on a violation of the revenue laws, and especially that class of them which does not expressly declare the contract void. The case of Aiken v. Blaisdell, 41 Vermont, 653, is a strong case, going to sustain a contract of sale contrary to law. We prefer, however, to stand by our own decisions. The case of Maybin v. Coulon, *supra*, was based upon a violation of the revenue laws of the United States, and the unbroken current of authorities in this State, is to hold a contract void which is grounded upon a clear violation of a statute, although it may not be expressly so declared by its terms."

This decision is directly *contra* to that of our own Supreme Court in Craig v. Dimock, *supra*.

In Scott v. Gillmore, 3 Taunton, 226, which was an action upon a bill of exchange given in part for a loan and part for spirits furnished by the payee, the court said:

"The statute does not, indeed, in terms, avoid a security, but it makes the consideration illegal, not merely void; and the security is entire, and can not be apportioned; and since it is partly given for an illegal consideration, the whole bill is void."

In Stevenson v. Ewing, 87 Tenn. 46, which was an action by a real estate broker for commissions, the court held that he could not recover, saying:

"It is earnestly insisted by learned counsel for Ewing that the sole purpose of the act under consideration is to raise and secure the collection of revenue, and not to prevent the business of real estate brokers as being against good morals or contrary to public policy; and that, such being the purpose of the act, the courts should construe it so as not to affect the validity of the contracts of such brokers, though made without license. The rule of construction thus insisted upon is sound and well recognized. But there

is no room for its application in this case. It is called into requisition by the courts, only when there is doubt, from the language of the statute itself, whether or not the legislature intended to prohibit the exercise of the privilege without license.

We have already seen that no such doubt exists with respect to the language of the act before us. The prohibition is distinct and absolute. That ends all construction."

In Lamond et al. v. Dunkin, 10 Barnwell & Cresswell, 93, 21st Eng. Com. Law, 49, in commenting upon various cases as to the carrying on of certain avocations where an act of parliament required a license for so doing, the court said :

"Those cases are very different from those where the provisions of acts of parliament have had for their object the protection of the public, such as the acts against stock-jobbing, and the acts against usury. It is different also from the case where a sale of bricks, required by act of parliament to be of a certain size, was held to be void because they were under that size. There the act of parliament acted as a protector to the public as well as to the revenue, securing to them bricks of the particular dimensions. Here the clause of the act of parliament had not for their object to protect the public, but the revenue only. Neither is this one of that class of cases where an attempt is made to recover the price of prohibited goods. On the authority of the two cases which I have mentioned, we think the plaintiffs are entitled to retain their verdict."

In Cope v. Rowlands, 2 Exchq., 12th Eng. Com. Law, 149, an action by a broker to recover commissions, the court say:

"The sole question is, whether the statute means to prohibit the contract. In the cases of Brown v. Duncan, 10 Barnwell & Cresswell, 93, and Wetherell v. Jones, 3 Barnwell & Alderson, both cases of violation of the revenue laws, the particular contract sued upon was held not to be interdicted; and in Johnson v. Hudson, 11 East, 160, as explained in the judgment of the court of King's Bench in Foster v. Taylor, 5 Barnwell & Alderson, 898, the provision of the statute which requires persons dealing in tobacco to take out a license, was held to be a regulation attaching to the plaintiff personally, and affecting him with the penalty, for the purpose of securing the license duty only, and not forbidding the contract itself, though it is to be observed that some doubt has been thrown on the par-

ticular case in a very learned work. 2 Starkie on Evidence, 886. The principle, however, of that decision, is correct, and the question for us now to determine is, whether the enactment of the statute * * * is meant merely to secure a revenue to the city, and for that purpose to render the person acting as a broker liable to a penalty if he does not pay it, or whether one of its objects be the protection of the public, and the prevention of improper persons acting as brokers. The court held ' that it appearing from the statute itself that provision was made for securing the good conduct of persons admitted and that all persons who should act as brokers should be admitted by the court of mayor and aldermen under such restrictions and limitations for their honest and good behavior as the court shall think fit and reasonable, showed clearly that the legislature had in view, as one object, the benefit and security of the public in these important transactions which are negotiated by brokers, and therefore the clause which imposes a penalty must be taken to imply a prohibition.' "

In Widoe v. Webb, 29 Ohio State, the plaintiff was not allowed to recover upon a promissory note, given, as the evidence tended to show, in part for intoxicating liquor sold by the plaintiff to the defendant, in direct violation of the provisions of a highly penal statute.

In Brown v. Duncan, 5 Manning & Ryland, 115, it was contended that, the plaintiff having acted in violation of the statute concerning the sale of spirits, it was incompetent for him to sue for the prices of spirits illegally distilled, and that therefore the defendant who had guaranteed the price could not be sued. The court gave judgment for the plaintiff saying :

" The acts in question contained no clause preventing the carrying on of a distillery by persons who have not complied with the regulations prescribed for the security of a revenue. The present case is very different from those based upon acts of parliament, having for their object the protection of the public, the exchange of stock, called jobbing, and charges against usury or against the fraudulent making of bricks below a certain size. We therefore are of opinion that the plaintiffs are entitled to recover."

In Smith v. Mawhood, 14 Exchq. 452, 24 Common Law, 650, an action to recover for tobacco sold, with a plea that

the plaintiffs at the time of the sale had not a license to bill any tobacco, the court say :

"The question is, does the legislature mean to prohibit the act done or not?  If it does, whether it be for the purposes of revenue or otherwise, then the doing of the act is a breach of the law and no right of action can arise out of it.  But here the legislature has merely said that where a party carries on the trade or business of a dealer in or seller of tobacco, he shall be liable to a certain penalty, if the house in which he carries on the business shall not have his name, etc., painted on it, in letters publicly visible and legible, and at least an inch long, and so forth.  He is liable to the penalty, therefore, by carrying on the trade in a house in which these requisites are not complied with; and there is no addition to his criminality if he makes fifty contracts for the sale of tobacco in such a house.  It seems to me, therefore, that there is nothing in the act of parliament to prohibit every act of sale, but that its only effect is to impose a penalty, for the purpose of the revenue, on the carrying on of the trade without complying with its requisites.  I am of opinion, therefore, that both the pleas are bad, and that our judgment should be for the plaintiff."

In Taylor v. The Crowland Gas & Coke Company, 10 Hurlstone & Gordon, 36 Exch. 293, which was an action for preparing certain conveyances and deeds relating to real and personal estate, Parke, Baron, said:

"I am of opinion that the defendants are entitled to judgment.  The true principle is laid down in Cope v. Rowlands and Smith v. Mawhood; and the question in all these cases is, whether, looking at the statute, the object of the legislature in imposing a penalty was to prohibit the particular act, or whether it was for a different purpose.  Therefore, the simple point which we have now to decide is, whether the legislature intended to prohibit this act being done under a penalty, and thus render it illegal; for if so the plaintiff can not recover.  Now, looking at the statute, I am of the opinion that the object of the legislature was to confine the practice of drawing the instruments therein specified to a certain class supposed to have a competent knowledge of the subject, and to protect the public against the mistakes of inexperienced persons in matters of this kind; and with that view, the legislature has prohibited these acts being done except by a particular class of persons.

The object of the legislature could not have been merely to secure to the revenue the duty on certificates, because it is only certain persons who can by law obtain such certificates. In that respect the case is different from Smith v. Mawhood, where the object of the legislature was to compel the obtaining of licenses, which any one might obtain, to deal in a particular commodity."

. In Shepler v. Scott, 85 Pa. State, 329, which was an action to recover commissions for bringing about the sale of real estate, the main ground of defense was that the plaintiff could not recover without showing that he had a license to act as a real estate broker; the court say, that under the pleading his right to recover did not depend on proving that he had a license, and aside from this there was no evidence that the plaintiff was engaged in the business of a real estate broker as an occupation, or that he held himself out to the public as such.

In Lindsey v. Rutherford, 56 Ky. (17 B. Monroe) 246, an action upon a bill of exchange, in which the defense was that the plaintiff purchased the bill while he carried on and conducted the business of an exchange dealer of grain and without having obtained a license to carry on such business, and that his purchase of said bill was therefore contrary to the policy of the law and void, the court, quoting from Chitty on Contracts, 419, say:

" There are many statutes, the object of which is to raise a revenue, rendering it necessary for persons dealing in specified goods to take out a license for that purpose and inflicting a penalty on them for their neglect to do so."

In this case, there was, however, no intention to prohibit the sale of such goods, but merely by inflicting a penalty personally on the seller, to secure the receipt of the revenue, and the price of the goods sold even by an unlicensed vendor might therefore be recovered.

"These general principles will enable us to arrive at a proper conclusion in the present case. The dealing in bills of exchange, in view of the statute, is neither *malum in se* nor *malum prohibitum*. Contracts for their sale and purchase are not prohibited by the statute; they are neither evil in themselves nor evil because forbidden by the statute. The

Douthart v. Congdon.

statute strikes no blow at the business itself, but simply declares upon this subject that 'if any person shall carry on, conduct, or engage, directly or indirectly, in the business of a broker or exchange dealer, by the purchase of bills of exchange, etc., without a license, besides the tax imposed, he shall forfeit and pay to the commonwealth one thousand dollars.' The business may be carried on; the business itself is not prohibited; it is lawful to deal in bills of exchange; but, if carried on without a license, the person doing so shall forfeit and pay to the commonwealth one thousand dollars."

We conclude, therefore, that our statute, in this regard, is essentially a revenue measure, designed to raise revenue from a business esteemed by the legislature as very profitable, and authorizing the requisition of a tax from him who thinks proper to engage in the business.

In Pope v. Beals, 108 Mass. 561, an action to recover commissions on the sale of a horse to the defendant, the judge at *nisi prius* was asked to rule that the plaintiff could not recover, because he had no license and had paid no special tax. This the court refused to do, and his ruling, with judgment for the plaintiff, was affirmed by the Supreme Court.

In Ruckman v. Bergholz, 37 N. J. Law, 437, an action of assumpsit to recover compensation for services as an agent in selling real estate, a defense interposed was that the plaintiff had at the time of the sale no license. The court said :

" The question in such cases is, whether the statute was intended as a protection, or merely as a fiscal expedient; whether the legislature intended to prohibit the act unless done by a qualified person, or merely that every person who did it should pay a license fee. If the latter, the act is not illegal.   *   *   *   The internal revenue law pre-scribed no qualification for a real estate agent. Any one who should have taken out the requisite license would have been authorized *ipso facto*, so far as that law was concerned, to carry on the business without respect to his qualifications. It did not undertake to declare any act done by an unlicensed person, acting as a real estate agent, invalid. Its sole object in requiring a license in such case was to raise revenue."

The power of the city council in respect to the business done by brokers and commission merchants is derived from clause 4 and clause 91 of section 6 of chapter 24 of the Revised Statutes, which are as follows :

Clause 4. "To fix the amount, terms and manner of issuing and revoking licenses.

Clause 91. "To tax, license and regulate auctioneers, distilleries, breweries, livery-stables, lumber-yards, public scales, money changers and brokers."

No authority has been given to the city to make the business of brokers or commission merchants unlawful. Nor does the statute forbid the carrying on of such business without the obtaining of a license. Nor is either character or qualification required of persons who engage in such business. The statute has simply given to cities the opportunity to obtain revenue from licenses given by it to commission merchants.

The statute in this regard is quite variant from what it is as to some other occupations. The statute entitled "Dram-shops," is highly penal, and clearly forbids the selling of liquor without the obtaining of a license. It is not merely a revenue act. So, too, the statute concerning the practice of medicine, directly forbids the "practice of medicine, or any of the practices thereof, or midwifery, in this State, without first applying for and obtaining a license from the State Board of Health to do so."

This is an enactment designed to protect the public health and the people from imposition. The business of a commission merchant is neither *malum prohibitum* nor *malum in se*.

No cross-errors are assigned. The judgment of the Circuit Court is affirmed.